# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

MARY DELGROSSO, §
§
    *Plaintiff*, §
§
*versus* § CIVIL ACTION NO. 3:13-1470
§
CAROLYN W. COLVIN, §
Acting Commissioner of §
Social Security, §
§
    *Defendant.* §

## REPORT AND RECOMMENDATION

Having filed an administrative claim in 2007 and a second one in 2010, having successfully prosecuted one federal judicial-review action, and having participated in at least seven administrative evidentiary hearings involving medical records dating back to the early 2000s, the plaintiff, Mary Delgrosso ("Delgrosso"), finally obtained a partially-favorable administrative adjudication of disability stemming from mental impairments. The defendant Commissioner of Social Security ("Commissioner") awarded Delgrosso supplemental security income[1] commencing August 26, 2010, but denied her applications for disability

---

[1]     Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line. *See* Social Security Administration, Social Security Handbook, § 2100 (14th ed. 2001).

insurance benefits[2] and supplemental security income for a period of July 1, 2003, through August 25, 2010, finding that she retained physical and mental residual functional capacity for substantial gainful activity.

Delgrosso now brings a second federal action seeking judicial review of a massive administrative record consisting of over 3,100 pages. She requests that the adverse portion of the Commissioner's decision "be remanded and be reversed with benefits paid and/or remanded for further proceedings." (Dkt. No. 12, p. 24).

## I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

---

[2]     Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability. *See* 42 U.S.C. § 423(a); *see also Mathews v. Castro*, 429 U.S. 181, 186 (1976).

## II.  Background

Delgrosso, born in 1964, attended regular education classes in Florida, but dropped out of school in tenth grade.  She obtained a GED[3] certificate in or around 1981.  (T. 27-28, 345, 689).

She married her first husband at age 16.  He physically abused her until she left, and returned to New York where she had family.  (T. 1485, 1503).  She remarried; claims her second husband also was abusive; but remained married for 20 years (until 2008) when he left her for another woman.  (T. 689, 1484-85, 1503).  Delgrosso has no children.  (T. 345).

Delgrosso began working at age 12, laying carpet and flooring for her step-father.  (T. 1503).  As an adult, she cleaned in a mobile home park, and worked in assembly at a factory.  (T. 158).  She also held a job at a screen print company as well as several part-time jobs, including bartending.  (T. 145, 345).  Delgrosso last worked in 2003 as a customer service representative at a feed store.  (T. 28, 157-58, 345).  She has a driver's permit.  (T. 689).

In 2011, Delgrosso began participating in card games, playing in the World Series of Poker.  She made it to regional tournaments twice, and in 2013 won a game that got her in to the finals in Atlantic City and Las Vegas.  (T. 712-13).

Since childhood, Delgrosso has been legally blind in her right eye.  She claims to suffer from a variety of additional medical issues, including fibromyalgia, low back pain, radiculopathy, degenerative disc disease, hip pain,

---

[3]      General Educational Development ("GED") tests are a group of subject tests which, when passed, certify that the test taker has high school-level academic skills. Generally, States award a Certificate of High School Equivalency or similarly titled credential to persons who meet the passing score requirements.

left leg pain, bilateral knee pain, right elbow pain, tendonitis, bursitis, migraine headaches, arthritis, irritable bowel syndrome, GERD, endometriosis, syncopal episodes, insomnia, sleep apnea, anxiety, depression, obsessive compulsive disorder, and post traumatic stress disorder. (T. 32-38, 586, 694-706, 731-34).

Delgrosso's surgical history includes a tonsillectomy in 1970, right breast excisional biopsy in 1989, removal of ovarian cysts in 1990s, carpal tunnel surgery in 1990, hysterectomy in 2000, right elbow ostectomy in 2004, right breast mastectomy in 2010,[4] right finger injury repaired 2005, right breast reconstruction in 2010, and arthroscopy on her right knee in 2011. (T. 585-88, 1024, 1140-41, 1142).

In August or September, 2010, Delgrosso began weekly counseling sessions to address mental issues. (T. 14884-85). In 2012, she fractured her left shoulder after tripping over her dog, but it healed without surgical intervention. (T. 1545-46). She smoked cigarettes for over thirty years. (T. 586, 2779). She was counseled about smoking cessation, but continues to "take a drag" off a cigarette when stressed. (T. 706, 2779).

### III. Claims

In 2007, when Delgrosso was 43 years old, she applied for disability-based social security benefits. She claimed to be disabled due to "tendonitis, lumbar joint syndrome, fibromyalgia, arthritis, migraines, anxiety, depression . . .legally blind in right eye" commencing July 1, 2003. (T. 156-57).

---

[4] In February 2010, Delgrosso was diagnosed with early stage carcinoma in her right breast. (T. 585).

# IV.  Commissioner's Decision

Delgrosso's application was assigned to ALJ Robert Gale ("ALJ Gale") who, after extensive administrative and judicial proceedings (described *infra* in Section VI.*B*.1) conducted a final evidentiary hearing on August 30, 2013. Delgrosso, represented by counsel, testified as did an impartial vocational expert Josiah L. Pearson.  (T. 643).  The record also consisted of testimony and documentary evidence presented in prior hearings.  (T. 643).

ALJ Gale utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act.[5]  ALJ Gale found that Delgrosso has several severe impairments:

- degenerative disc disease of the lumbar spine (as of March 2012);
- legal blindness of the right eye;
- myofascial pain syndrome;[6]
- status post breast reconstruction (as of November 30, 2010);
- depressive disorder (variously characterized) (as of August 26, 2010); and
- anxiety disorder (variously characterized) (as of August 26, 2010).

---

[5]      *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[6]      Myofascial pain is "pain attributed to trigger points in muscles and their fascia, with more specific points of origin than with fibromyalgia." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1384 (31st ed. 2007).

(T. 646). He then found that since the alleged onset date of July 1, 2003, none of these impairments was so severe as to be presumptively disabling under 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (the "Listings").[7] (T. 652).

ALJ Gale next found that *prior* to August 26, 2010, Delgrosso retained physical and mental capacities to perform work at the light exertional level with certain exertional and nonexertional limitations described in the note below.[8] (T. 654). She was unable to perform her past relevant work as it exceeded her physical residual functional capacity (T. 663), but she could perform alternative work, and, therefore, was not disabled prior to August 26, 2010. (T. 663).

Beginning on August 26, 2010, however, ALJ Gale found that Delgrosso retained "no useful ability to respond appropriately to usual work situations and deal with changes in a routine work setting." (T. 664-65). Thus, as of that date,

---

[7] The Commissioner has published in the Listings a series of impairments describing a variety of physical and mental conditions, indexed according to the body system affected. Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

[8] ALJ Gale assessed Delgrosso's residual functional capacity prior to August 26, 2010, as follows:

. . . I find that prior to August 26, 2010, the date the claimant became disabled, the claimant had the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently, sit for 6 hours in an 8 hour workday, stand/walk for 6 hours in an 8 hour workday, occasionally engage in postural activities, could frequently use her upper extremities to reach in all directions, handle, finger and feel and should avoid working with unprotected heights and moving machinery. Prior to August 26, 2010, the claimant had no significant limitation on her ability to perform the basic mental demands of work, which include the abilities to understand, carry out and remember simple instructions and some complex instructions; respond appropriately to supervision, coworkers and usual work situations and deal with changes in a routine work setting.

(T. 654).

there were no jobs Delgrosso could perform. (T. 664). Consequently, ALJ Gale concluded that Delgrosso became disabled on that date.

Based on these findings, ALJ Gale issued a partially favorable decision, concluding that Delgrosso was not disabled prior to August 26, 2010, but became disabled on that date. (T. 644, 665). The Appeals Council denied Delgrosso's request to review; Delgrosso then instituted this proceeding.

## V.  Points of Alleged Error

Delgrosso challenges the portion of the decision denying disability prior to August 26, 2010.[9]  Delgrosso's brief proffers five points of error:

1.  The ALJ relies on evidence not in the record;

2.  The ALJ fails to assess all severe impairments;

3.  The ALJ violated the treating physician rule;

4.  The ALJ's RFC determination is not supported by substantial evidence; and

5.  The ALJ erred in his assessment of the Plaintiff's credibility concerning the intensity, persistence, and limiting effects of her symptoms.

(Dkt. No. 12, p. 0).

## VI.  Alleged Reliance on Evidence Outside Record (Point I)

ALJ Gale relied heavily on forensic opinions of three consultative medical experts[10] when assessing Delgrosso's physical residual functional capacity prior

---

[9]  Delgrosso was last insured for purposes of disability insurance benefits on December 31, 2005. (T. 644, 646, 665). The effect of ALJ Gale's decision was to preclude Delgrosso from receiving potentially more generous disability insurance benefits for a greater period of time.

[10]  The three consultative medical sources were Charles Plotz, M.D. (rheumatologist with a secondary specialty in internal medicine), Woodrow Janese, M.D. (neurosurgeon and neurologist), and Stuart Kaplan, M.D. (rheumatology and internal medicine). (T. 2957-65, 2684-92, 2924, 3111-53).

to August 26, 2010. Delgrosso argues that such reliance was "fundamental error" because that evidence is not in the record. (Dkt. No. 12, p. 3). According to Delgrosso, it is from a "different case" before a different administrative law judge, was not incorporated into "this case" during the August 2013 hearing, and ALJ Gale never proffered exhibits from the "other case" to Delgrosso and/or otherwise advised that they were being considered. (Dkt. No. 23). According to Delgrosso, this violated various "HALLEX" guidelines[11] and her constitutional right to Due Process. (*Id.*).

Delgrosso further argues, in any event, that ALJ Gale violated governing circuit law and common sense by giving substantial weight to forensic opinions of medical advisers who did not personally examine or treat Delgrosso over those of treating physicians.

## A. *Consultative Medical Opinion*

Regarding this latter argument, Delgrosso's brief cites early cases stating that opinions of medical sources who did not personally examine claimants deserve little weight in the overall evaluation of disability.[12] Current regulations, however, recognize that the Commissioner's consultants are highly trained physicians with expertise in evaluation of medical issues in disability claims.

---

[11]    Through a Hearings, Appeals and Litigation Law ("HALLEX") manual, the Deputy Commissioner for Disability Adjudication and Review conveys guiding principles, procedural guidance, and information to Office of Disability Adjudication and Review staff. HALLEX defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, Appeals Council, and civil action levels. It also includes policy statements resulting from Appeals Council *en banc* meetings under the authority of the Appeals Council.    *See* http://ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html (last visited May 7, 2015).

[12]    *See, e.g.,* *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990); *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987).

*See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f) (2), 416.912(b)(6), 416.913(c), and 416.927(f)(2). As such, their opinions may constitute substantial evidence in support of residual functional capacity findings. *See McEaney v. Commissioner of Soc. Sec.*, 536 F. Supp.2d 252, 256 (N.D.N.Y. 2008) ("evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence ... [of] . . . RFC assessments [because] ... [s]tate agency consultants are experts in evaluating the medical issues of disability claims.") (citations omitted). And, in appropriate cases, their opinions can override treating-source opinions. *See Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir. 1995) (explaining that "the opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record.") (citations omitted).[13]

Delgrosso's global objection to reliance on nonexamining medical advisers' opinions must, therefore, be rejected.

## B.  Evidence "Outside the Record"

Delgrosso accurately states that evidence from the medical advisers listed in note 10, *supra*, was not identified as exhibits or formally introduced at the August, 2013, evidentiary hearing before ALJ Gale. Nor did ALJ Gale provide post-hearing notice of receipt of that evidence or an opportunity to object or

---

[13]     In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.

SSR 96-6p, Titles II And XVI: Consideration of Administrative Findings of Fact By State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review, 1996 WL 374180, at *3 (SSA July 2, 1996).

present additional evidence. Delgrosso correctly notes further that this evidence appears in two different *supplemental* transcripts containing over 1,600 pages filed after this action for judicial review was pending and after the original administrative transcript was filed in this case. (Dkt. Nos. 8, 15, 19). Delgrosso argues that reliance on information not contained in the record is fundamental error and a denial of Due Process if considered without notice and other procedural safeguards.[14]

### 1.    Procedural History

These arguments must be evaluated in context. In November. 2007, Delgrosso applied for supplemental security income and disability insurance benefits alleging disability beginning on July 1, 2003. After her claim was denied initially, she requested and received an evidentiary hearing before ALJ Gale, who denied the application in a written decision dated June 25, 2010. (T. 7-22). After the Appeals Council denied a request for review (T. 1-4), she

---

[14]    Delgrosso alleges the following provisions of HALLEX were violated:

- HALLEX 1-2-1-35 indicates that there must be provided to the claimant or representative an opportunity before the hearing to examine, "the material that constitutes or will constitute the evidence of record."

- HALLEX 1-2-6-34 requires, "if the claimant or the representative has not examined the administrative record that constitutes or will constitute the evidence of record for a decision, including any proposed exhibits, the administrative law judge (ALJ). . .must give them the opportunity to examine the material before the hearing."

- HALLEX 1-2-6-58 § (c) states that, "ALJ will make the proposed exhibits a part of the record by:

  • Asking the claimant (or appointed representative, if any) whether he or she has had an opportunity to examine the exhibit;
  • Asking the claimant (or appointed representative, if any) if there are any objections to admitting the proposed exhibits into the record;
  • Ruling on any objections to the proposed exhibits.

(Dkt. No. 23).

filed an action for judicial review. It resulted in a consensual remand. (T. 768-69).[15] The claim was reassigned to ALJ Gale to conduct a second evidentiary hearing.

While seeking Appeals Council and judicial review described above, Delgrosso filed a second administrative claim on July 28, 2010. Therein, she asserted the same grounds for disability, but alleged a later onset-of-disability date, *viz.,* February 19, 2010, instead of July 1, 2003.

This latter claim was assigned to administrative law judge Barry Ryan (ALJ Ryan), who submitted written interrogatories to and obtained written responses from three consulting medical experts, Drs. Janese and Plotz (*see* note 10, *supra*) and Chukwuemeka Efobi, M.D., a psychiatrist. (T. 642, 2684-92, 2957-65, 2966-73). After receiving these consultants' responses, ALJ Ryan held four evidentiary hearings between 2011 and 2013, wherein claimant as well as Dr. Janese, Dr. Efobi, and Dr. Stephan Kaplan, M.D.,[16] testified. (T. 642, 3081-3109, 3116-3148).

During the fourth evidentiary hearing on June 26, 2013, Delgrosso's counsel requested:

> . . .[I]t would be our preference to simply withdraw this case, so that without prejudice *all matters, including both the old time and the current time can be decided in the first case . . . and that that case then decide everything*, rather than having two completely different decisions and two completely different cases.

---

[15]     *See Delgrosso v. Astrue*, No. 3:11cv814 (NAM/ATB) (N.D.N.Y. Feb. 6, 2012) (consent order remanded).

[16]     Dr. Kaplan, who specializes in rheumatology and internal medicine, was sent written interrogatories, but did not return them. Instead, he testified as to his responses. (T. 3111-3153).

(T. 3118-19) (emphasis added). Delgrosso's counsel argued that "[y]ou are the later one. . . . That's why I was saying, it doesn't make sense to have two separate decisions." (*Id.*). ALJ Ryan granted that request and relinquished his jurisdiction. (T. 3150-52). (T. 3150).

During an evidentiary hearing before ALJ Gale later that summer on August 30, 2013, ALJ Gale noted that the application pending before ALJ Ryan was consolidated with claims under his initial jurisdiction. (T. 643, 683). Thus, the two pending parallel claims based on the same alleged disability, but claiming different onset dates ultimately merged into a single proceeding before ALJ Gale. (T. 683).

2. <u>Discussion</u>

A conclusion that ALJ Gale erroneously based his decision on evidence outside the record or otherwise deprived Delgrosso of her right to Due Process is not warranted. At Delgrosso's request, her parallel claims were consolidated allowing "everything [to be] heard in one case." (T. 3151-52). Delgrosso's contention that she did not receive due process because she was not explicitly informed at or after the August, 2013, evidentiary hearing before ALJ Gale that evidence elicited during earlier recent hearings before ALJ Ryan would be used when deciding the consolidated claims is sophomoric, if not tongue-in-cheek. It is absurd to argue that ALJ Gale should have retraced the evidence-gathering exercise already accomplished by ALJ Ryan or otherwise ignored that evidence.

Delgrosso was aware of these medical advisers' opinions as reflected in their interrogatory answers. Her attorney had unlimited time to cross-examine

all but one during prior hearings before ALJ Ryan prior to consolidation of the two parallel claims.[17]   While she makes a colorable argument that she did not have an opportunity to personally cross-examine Dr. Plotz, she proffers no discrete suggestions, even now, that there was a basis to impugn Dr. Plotz's opinions through cross-examination.   Under this circumstance, a procedural deficiency stemming from lack of cross-examination but with no  arguable prejudice does not rise to the level of a constitutional violation.

The HALLEX provisions cited by Delgrosso clearly are directed toward distinctly different procedural scenarios, and, in any event constitute internal agency documents without force of law.   *See Jones-Reid*, 934 F. Supp.2d 381, 407-08 (D. Conn. 2012) (citing *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (collecting cases)).   "Therefore, they do not create judicially enforceable duties, and we will not review allegations of noncompliance with their provisions." *Id.*[18]

---

[17]      ALJ Ryan permitted Delgrosso's attorney to cross-examine the medical experts with few interruptions and allowed questioning to continue until her counsel had exhausted his questions to each doctor.   Counsel questioned Dr. Janese for approximately 60 minutes. (T. 3082-3108).   Likewise, with Dr. Kaplan, ALJ Ryan questioned Dr. Kaplan at length about the interrogatories and Delgrosso's counsel was permitted to cross-examine Dr. Kaplan after every interrogatory section reviewed.   (T. 3123-48).

Dr. Plotz did not attend and testify because of his wife's illness, but he provided opinion evidence through answers to interrogatories dated December 2012, several months prior to the June 2013 hearing.   (T. 2957-65, 3148).   On January 4, 2013, ALJ Ryan sent Delgrosso's attorney Dr. Plotz's interrogatory responses designated as "additional evidence/proposed exhibit C69F." (T. 1927-28).   Delgrosso cannot plausibly argue that she was blind-sided by Dr. Plotz's evidence, or that she had no opportunity to offer rebuttal evidence.

[18]      *See also Valet v. Astrue*, No. 10-CV-3282 (KAM), 2012 WL 194970, at 12 n.21 (E.D.N.Y. Jan. 23, 2012) (quoting *Grosse v. Commissioner of Soc. Sec.*, No. 08-CV-4137, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (citation omitted))("'a failure to follow procedures outlined in HALLEX does not constitute legal error.'"); *Doherty v.. Astrue*, No. 07-CV-954 (FJS/VEB), 2009 WL 1605360, at *8 (N.D.N.Y. Jun. 5, 2009)(provisions of HALLEX are not binding on the SSA).

# VII. Severity Determination (Point II)

Under sequential evaluation, disability claimants must show that they have one or more severe impairments. "Impairments" are anatomical, physiological, or psychological abnormalities demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D); *accord* 20 C.F.R. §§ 404.1508, 416.908. "Severe" impairments are those that significantly limit physical or mental abilities to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).[19]

ALJ Gale found that Delgrosso has severe impairments of degenerative disc disease of the lumbar spine (as of March 2012), legal blindness of the right eye, myofascial pain syndrome, status post breast reconstruction (as of November 30, 2010), depressive disorder (variously characterized) (as of August 26, 2010), and anxiety disorder (variously characterized) (as of August 26, 2010). He declined to find other alleged physical and mental irregularities to be severe impairments.

## A. *Delgrosso's Challenge*

Delgrosso contends that ALJ Gale erred because medical evidence reveals multiple diagnoses of both fibromyalgia and migraines. (Dkt. No. 12, pp. 6-11). Delgrosso argues that pain associated with fibromyalgia made it difficult to complete her daily chores, and, by necessary inference, it would have more than

---

[19]     In this circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' . . . [with] . . . 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987)).

minimal effect on her ability to engage in work activities. Thus, ALJ Gale should have found these conditions to be additional severe impairments.

## B.   *Application*

### 1.   Fibromyalgia

Applying the standard definition of an impairment is a straightforward exercise with respect to most physical and mental impairments because they can be identified objectively through standard laboratory, imaging, physical examination and psychological diagnostic techniques. It becomes problematic, however, with respect to fibromyalgia, a medical abnormality consisting of a syndrome of chronic pain of musculoskeletal origin but *uncertain cause.*[20]

The Commissioner, nevertheless, recognizes fibromyalgia as a potentially disabling impairment, and describes it as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *See* SSR 12-2p, TITLES II AND XVI: EVALUATION OF FIBROMYALGIA, 2012 WL 3104869, at *2 (SSA July 25, 2012). This ruling provides guidance on evidence required "to establish that a person has a medically determinable impairment of fibromyalgia" and how to evaluate its limiting effects. *Id.*, at *1. The Commissioner recognizes two sets of criteria (11 of 18 "trigger points" or 6 "signs/symptoms/co-occurring

---

[20]    *See Green-Younger v. Barnhart*, 335 F.3d 99, 101 n.1 (2d Cir. 2003) (citing *Stedman's Medical Dictionary* 671 (27th ed. 2000)(defining fibromyalgia as "a syndrome of chronic pain of musculoskeletal origin but uncertain cause")).

conditions") for diagnosing fibromyalgia.[21]  *Id.*   The Commissioner also recognizes that diagnosis generally is reached by a process of *exclusion*, *i.e.*, eliminating other medical conditions which might manifest similar symptoms of musculoskeletal pain, stiffness and fatigue.  *Id.*, at *3 & n.7.

Delgrosso's medical treatment records from various providers contain undifferentiated *notations* of fibromyalgia and associated pain, but none contains *clinical findings* necessary to establish fibromyalgia as an impairment under SSR 12-2p.  Indeed, none lists fibromyalgia as a formal diagnosis.[22]  Rather, they simply record Delgrosso's own reports by history, not independent diagnoses.

---

[21]    The first set of criteria, based upon the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia, requires a finding of "at least 11 [out of 18 designated] positive tender points on physical examination," which must be found bilaterally and both above and below the waist.  *See* SSR 12-2p, 2012 WL 3104869, at *3.

The second set of criteria, based upon the 2010 ACR Preliminary Diagnostic Criteria, requires "repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome."  *Id.*   Under this second diagnostic method, "signs" include certain "somatic symptoms."  *Id.*, at *3 n. 9.

Essential to both sets of criteria are (1) findings of widespread pain, "that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least three months," and (2) evidence that other disorders that could cause the symptoms and signs had been excluded.  *See* SSR 12-2p, 2012 WL 3104869, at *2-3.

[22]    In April 2008, a Florida consultative examiner, specializing in internal medicine, Andrew Rutherford, M.D., listed fibromyalgia as an "impression." It appears to be made from Delgrosso's subjective "history of present illness" wherein she lists/describes fibromyalgia.  (T. 362-63, 366).

Dr. Rutherford's examination findings do not support a fibromyalgia diagnosis: She had no palpable muscle spasms; she had full muscle strength and flexion in all areas; sensory examination was normal; straight leg test was negative; musculoskeletal normal . . .but unable to walk on heels and toes and tandem walking abnormal.  She could stand but not hop on one foot bilaterally.  (T. 365).

Dr. Rutherford opined that, in any event, Delgrosso's supposed fibromyalgia "does not grossly affect her motor function and in that respect is not disabling."  (T. 366).

Delgrosso's subjective report cannot be the basis for finding an impairment. *See* 20 C.F.R. §§ 404.1508, 416.908.

Paul Hodgeman, RPAC, "assessed" fibromyalgia (T. 593, 940). Under the governing regulation, physician's assistants are designated as "other" medical sources.[23] Only "acceptable" medical sources, however, can establish existence of medically-determinable impairments.[24] *See* 20 C.F.R. §§ 404.1513(a), 416.913(a); SSR 06–03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006). Consequently, PA Hodgeman's "assessment" was not competent evidence to show that Delgrosso has an impairment of fibromyalgia.

ALJ Gale did not err in failing to find that Delgrosso suffered from a severe fibromyalgia impairment prior to August 26, 2010.

2.    Migraines

Delgrosso's primary care physician, R. W. Turkington, M.D., noted "severe migraine, 4 days," in November, 2001 (prior to the alleged July 1, 2003, disability onset date). (T. 272). In July and August 2007, Delgrosso's pain management specialist, George S. Sidhom, M.D., recorded that Delgrosso was experiencing headaches. He diagnosed them, however, as "spinal." (T. 298, 438, 440, 450). Consultative examiner, Dr. Rutherford, recorded Delgrosso's

---

[23]    "Other" sources are ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06–03p, 2006 WL 2329939, at *2.

[24]    "Acceptable" medical sources are licensed physicians (medical or osteopathic doctors), psychologists, optometrists, podiatrists, and speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a).

subjective *history* of migraine headaches  (T. 363-64), but his impression as of April 26, 2008, was that they appeared "controlled" and "do not sound disabling on interview with patient." (T. 366).

Given Delgrosso's sporadic treatment for headaches, and Dr. Rutherford's impression, ALJ Gale did not err in failing to find that Delgrosso suffered from a severe migraine impairment.

## VIII.  Residual Functional Capacity (RemainingPoints)

Delgrosso's remaining points of error ultimately challenge ALJ Gale's assessment of "residual functional capacity" for the period commencing on July 1, 2003 (date of alleged disability onset) up until August 26, 2010 (when Delgrosso was found to be disabled due to mental impairments and eligible for supplemental security income ).  This term of art refers to what claimants can still do in work settings despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain.  *See* 20 C.F.R. §§ 404.1545, 416.945.  Before considering whether severely impaired persons can perform their prior relevant work (Step 4) or alternative available work (Step 5), administrative law judges make predicate findings as to whether applicants, notwithstanding severe impairments, retain physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis.[25]

---

[25]    Through a formally-promulgated regulation and internal policy rulings, the Commissioner has established a detailed and elaborate analytical protocol for assessing residual functional capacity. *See* 20 C.F.R. §§ 404.1545(b), (c), 416.945(b), (c) (listing for comparative purposes various physical and mental abilities relevant for work activity on a regular and continuing basis); SSR 96-8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *5-6 (SSA July 2, 1996) (prescribing function-by-function assessment of a claimant's physical and mental capacities).

When assessing residual functional capacity, administrative law judges must consider "all of the relevant medical and other evidence." *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). In practice, administrative law judges rely principally on medical source opinion and subjective testimony when assessing impaired individuals' ability to engage in work-related activities. Inevitably, they must weigh the credibility of that evidence.

The Commissioner prescribes multi-factor protocols for weighing credibility of forensic medical opinions and subjective testimonies. ALJ Gale's alleged violations of these protocols generate Delgrosso's remaining complaints.

A.   *Evaluating Medical Opinion*

The Commissioner categorizes medical opinion evidence by "sources" described as "treating,"[26] "acceptable" and "other." Evidence from all three sources can be considered when determining severity of impairments and how they affect individuals' ability to function. *See* SSR 06–03p, 2006 WL 2329939, at *2.

A "treating physician rule" requires, moreover, that administrative law judges defer and give controlling weight to opinions of treating sources regarding the nature and severity of impairments when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not

---

[26]   *See* 20 C.F.R. §§ 404.1502, 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

inconsistent with the other substantial evidence in [the] case record."[27]  But, when treating source opinions swim upstream, contradicting other substantial evidence (such as opinions of other medical experts), they can be rejected.[28]  A treating physician's opinion also may be discounted when it is internally inconsistent,[29] lacks underlying expertise,[30] is brief, conclusory and unsupported by clinical findings,[31] or appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected.[32]

When controlling weight is not afforded to treating-source opinion, or when other medical-source opinions are evaluated, administrative judges must apply certain regulatory factors to determine how much weight, if any, to give such opinions: (1) length of treatment relationship and the frequency of examination; (2) nature and extent of treatment relationship; (3) evidence that

---

[27]    20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *1–2; *see also Morgan v. Colvin*, No. 14-991-cv, 592 Fed. App'x 49, 50 (2d Cir. 2015); *Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

[28]    *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643–44 (2d Cir. 2007)(summary order); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

[29]    *See Micheli v. Astrue*, No. 11-4756-cv, 2012 WL 5259138, at *2 (2d Cir. Oct. 25, 2012).

[30]    *See Terminello v. Astrue*, No. 05-CV-9491, 2009 WL 2365235, at *6–7 (S.D.N.Y. July 31, 2009); *Armstrong v. Commissioner of Soc. Sec.*, No. 05-CV-1285 (GLS/DRH), 2008 WL 2224943, at *11, 13 (N.D.N.Y. May 27, 2008).

[31]    *See Perez v. Barnhart*, 415 F.3d 457, 466 (5th Cir. 2005); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Alvarado v. Barnhart*, 432 F. Supp. 2d 312, 321 (W.D.N.Y. 2006).

[32]    *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *see also Labonne v. Astrue*, 341 Fed. App'x 220, 225 (7th Cir. 2009); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

supports a treating physician's report; (4) how consistent a treating physician's opinion is with the record as a whole; (5) specialization of a physician in contrast to condition being treated; and (6) any other significant factors. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

## B. *Evaluating Subjective Testimony*

Claimants must present medical evidence or findings that underlying impairments could reasonably be expected to produce the symptoms they allege. *See* 42 U.S.C. §§ 423(d)(5(a))1382c(a)(3)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996). The best-informed (sometimes only) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms is the person who suffers therefrom. Testimony from claimants, therefore, is not only relevant, but desirable. On the other hand, such testimony is subjective and may be colored by interest in obtaining a favorable outcome.

Administrative law judges are tasked with making credibility assessments, *i.e.*, deciding how much weight to give to claimants' subjective self-evaluations. To guide administrative law judges through this important adjudicatory function, the Commissioner issued both implementing regulations and an internal policy ruling. SSR 96–7p directs administrative law judges to follow a two-step process to evaluate claimants' allegations of pain:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could

reasonably be expected to produce the individual's pain or other symptoms . . . .

Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96-7, 1996 WL 374186, at *2. When evaluating intensity, persistence and limiting effects of symptoms, the Commissioner's regulations require consideration of seven specific, *objective* factors (listed in the note below) that naturally support or impugn *subjective* testimony of disabling pain and other symptoms.[33]

## C.    *ALJ Gale's Credibility Choices*

ALJ Gale essentially credited opinions of nonexamining, consultative medical sources, and rejected medical opinions of Delgrosso's treating physicians regarding her impairment-related limitations. He further found Delgrosso's subjective testimony "not entirely credible" regarding intensity, persistence and limiting effects of his symptoms. Delgrosso argues that these credibility choices

---

[33]    An ALJ must evaluate a claimant's symptoms based on the medical evidence and other evidence, including the following factors:

(i)    claimant's daily activities;
(ii)   location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii)  precipitating and aggravating factors;
(iv)   type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v)    treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi)   measures claimant uses or has used to relieve pain or other symptoms; and
(vii)  other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

violated the "treating physician rule" and transgressed the governing protocol for assessing credibility of subjective testimony.

1. <u>Rejection of Treating Sources' Opinion</u>[34]

Delgrosso primarily complains about ALJ Gale's failure to defer to the opinions of treating sources Drs. Turkington and Sidhom, orthopedic surgeon Kyung Kim, M.D., and PA Hodgeman.

*Dr. R.W. Turkington, M.D. –treating primary care*

Dr. Turkington was Delgrosso's primary care physician from November 8, 2001, through August 13, 2004, in Florida. (T. 296-72). Dr. Turkington made cryptic notations of "[i]ntense fibromyalgia" and "intense pain [secondary to] fibromyalgia" in November 2001 and February 2003. (T. 270, 272). In similar fashion, he noted "severe migraine, 4 days," in November 2001. (T. 272).

To the extent that these terse notations might be considered opinions, ALJ Gale gave them "no weight." (T. 647). ALJ Gale found them "devoid of any clinical findings relating to the claimant's fibromyalgia." (*Id.*). Dr. Turkington did not document 11/18 trigger points. (*Id.*). ALJ Gale further found that his notes are "extremely brief and not very numerous." (*Id.*). He found that Dr. Turkington's notes showed little continuity of care, especially after the July 2003 alleged onset date, with only 2 visits eighteen months apart. (T. 269-72, 647).

---

[34]    Given the extensive medical record in this case and the exhaustive opinion by ALJ Gale, this section addresses only points raised by Delgrosso's brief.

### Dr. George S. Sidhom, M.D.–treating pain management

Dr. Sidhom provided pain management care to Delgrosso from June 6, 2005, through August 3, 2009, in Florida . (T. 334, 549). Dr. Sidhom did not list fibromyalgia as a diagnosis, but did note that "[s]he suffers from fibromyalgia and anxiety disorder." (T. 332). In July and August 2007, Dr. Sidhom recorded that Delgrosso was experiencing headaches, but diagnosed them as "spinal." (T. 298, 438, 440, 450).

In a May 6, 2010, "lumbar spine residual functional capacity" questionnaire, Dr. Sidhom reported that since 2005, Delgrosso can perform less than sedentary work as she can stand/walk for 2 hours in an 8 hour workday, sit for 4 hours, will have to take frequent breaks, can frequently lift up to 10 pounds and cannot engage in any postural activities. (T. 560-63).

ALJ Gale gave Dr. Sidhom's opinions "little weight." (T. 658). He reasoned that Dr. Sidhom's treatment notes do not substantiate the level of limitation opined. (*Id.*). Rather, they indicated that Delgrosso's status was stable over time, with no neurological deficits, muscular weakness or atrophy, negative straight leg raise bilaterally and a normal gait with the only positive finding being some tenderness in the lower back area. (T. 273-86, 288-343, 483-553).

### Dr. Kyung Kim, M.D.–orthopedic surgeon

Dr. Kim, an orthopedic surgeon, performed right knee arthroscopy on Delgrosso on September 15, 2011, to repair a torn right meniscus. Six weeks later, on October 26, 2011, Dr. Kim completed a questionnaire opining that from "9-15-11 to present," Delgrosso was "unable to work until further notice," and further stating that Delgrosso needed to change positions at will, sit for 6 hours, could not walk/stand for 2 hours, and could not lift any weight. (T. 1023-25).

ALJ Gale gave Dr. Kim's opinion little weight. (T. 658). He observed that the above opinion was meant to be temporary while Delgrosso recuperated from right knee arthroscopy of September 15, 2011. (*Id*.). He further noted that Delgrosso did not receive regular or intensive treatment from Dr. Kim since last seeing Dr. Kim on October 28, 2011. (*Id*.). Finally, he noted that the opinions of medical experts constitute significant evidence contrary to Dr. Kim's opinions and supercede Dr. Kim's temporary opinion. (T. 659).

### PA Paul Hodgeman, RPAC

PA Hodgeman saw Delgrosso at Lourdes Hospital from March through June 23, 2010. PA Hodgeman opined that Delgrosso could perform significantly less than sedentary work as she needs complete freedom to change positions, "definitely" would be absent from work more than 4 times per month, could lift and carry only up to 5 pounds, and has marked limitations in her mental functioning (*i.e.*, maintain attention and concentration; perform activities within a schedule, maintain regular attendance and/or be punctual within customary tolerances; and complete a normal work day and work week without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods).[35] (T. 1536-42).

ALJ Gale gave PA Hodgeman's opinions "little weight." (T. 657). ALJ Gale observed that PA Hodgeman is neither a mental health specialist nor an acceptable medical source under SSR 06-03p. (T. 657-58). ALJ Gale found that PA Hodgeman's treatment notes did not document a marked level of mental distress, and his treatment of Delgrosso's mental health was sporadic. (*Id*.). ALJ Gale observed that his treatment notes also did not substantiate a level of

---

[35]     The questionnaire was completed November 25, 2011; a supplement also was signed November 25, 2011; and an addendum was filled out July 22, 2013. They are referenced as a single exhibit in the administrative record.

physical distress indicated in his assessments. (*Id.*). ALJ Gale, found PA Hodgeman's treatment was mostly of the routine follow-up variety suggesting that Delgrosso's condition was quite stable over time. (*Id.*).

### 2. Rejection of Subjective Testimony

In two separate hearings before ALJ Gale, Delgrosso provided subjective testimony that, if fully credited, would impugn ALJ Gale's finding that between July 1, 2003, and August 26, 2010, she retained physical and mental capacity to engage in a limited range of light exertional work.[36] When assessing her subjective credibility, ALJ Gale found that Delgrosso's medically-determinable impairments reasonably could be expected to cause her alleged symptoms, but

---

[36] At a hearing in June 2010, Delgrosso testified that her primary problem was back pain. (T. 32). She also testified that she could not stand or sit for a long time (T. 33), and could walk only about a city block, stand and/or sit for only 20 minutes before needing to get off her feet and/or change positions. (T. 39). She maintained that she could lift only a couple of pounds. (T. 40). She lived with her brother who helped her with shopping, preparing meals (if a lot of stirring), cleaning up, and laundry. (T. 40-41). She also stated that she had trouble remembering things. (T. 32-33). She could take care of personal hygiene. Medications related to her back caused dizziness, nausea, headaches, and difficulties with memory and concentration. (T. 45).

In an August, 2013, hearing, Delgrosso testified that she lived with a man in his third floor, walk-up (no elevator) apartment. (T. 690-91). She testified that she could only sit or stand for 15 or 20 minutes before needing to change her posture. (T. 693). Her most significant medical condition was "fibromyalgia, back pain." (T. 694). She felt worn out and pain throughout all the parts of her body. (*Id.*). She had pain, tendinitis in her right elbow, causing her to drop items when overhead reaching. (T. 695). She received injections and eventually had surgery on her right elbow improving it some. (T. 695-69, 703). She also experienced anxiety attacks, causing her to get flustered, hard pressed to breathe, and crying for no reason. (T. 696). She testified she has post traumatic stress disorder and obsessive compulsive disorder. (T. 697, 699). She claimed to have suffered migraine headaches since she was a "wee little child." (T. 701). She stated she had joint disease that caused her "chronic pain." (*Id.*). She had "spells" causing her to have an "absent seizure" or "pass out." (T. 704). In 2010, she had a right mastectomy and reconstructive breast surgery. (T. 707).

Since August 2010, she was receiving weekly mental health counseling. (T. 707). She continued to perform light chores, cook simple meals, and received help with carrying laundry or groceries. (T. 708-09). She had taken vacations to Las Vegas, Biloxi, and Pensacola. (T. 709). She played cards twice a week and competed in different places in World Series of Poker. (T. 711-13) She took care of personal hygiene. (T. 711). Sometimes her medication made her feel "loopy." (T. 716).

her statements concerning intensity, persistence and limiting effects of her symptoms prior to August 26, 2010, were not entirely credible.

ALJ Gale explained his reasons for this credibility choice in detail. (T. 655-56). He first noted "[i]n general, the claimant's subjective complaints far outweigh the objective evidence, especially as they relate to her physical impairments." (T. 655). ALJ Gale pointed out that even though Delgrosso testified at the 2010 hearing that she has "arthritis all over" and has 14 or 15 other impairments, these impairments were either self-diagnosed or had not been treated regularly or intensively. (*Id.*). ALJ Gale cited numerous examples of Delgrosso's alleged physical impairments not bourne out by the medical evidence of record. (*Id.*). ALJ Gale further found probative lack of specialized mental health treatment until August 26, 2010, despite claims of longstanding, disabling mental impairments. (*Id.*).

Additionally, ALJ Gale found that Delgrosso's "travel and other activities of daily living suggested "physical ability to function greater than alleged." (T. 655). He explained:

> The claimant minimized her activities of daily living at the hearing, but she has also reported that she cooks1-3 times a day, shops 1-2 times a week, cares for her personal grooming without assistance, watches television, reads and enjoys fishing and horses. At the August 30, 2013 hearing, the claimant testified at length about her competitive poker playing, her qualifying for a trip to Atlantic City to continue play and her hope to qualify to go to Las Vegas for the finals. She also testified that, prior to 2006, she took vacations to Las Vegas, Biloxi and Pensacola and stated that she has not taken a vacation since then, yet she also testified that went to Atlantic City to play poker a few months prior to the August 30, 2013 hearing. . . . It was also her testimony that she does light housework chores such as dusting and washing dishes and puts groceries away.

(T. 655).

Finally, ALJ noted that Delgrosso has a "poor earnings history such that she is not entitled to any significant bolstering of her credibility due to work history. " He also found it to be significant that Delgrosso never reported medication side effects to her providers. (T. 655-56).

## D.   *Delgrosso's Challenge*

Delgrosso argues that treating source evidence which ALJ Gale rejected was well-supported and not inconsistent with other substantial evidence; hence it was entitled to controlling or great weight.[37]  She infers that crediting those opinions would have resulted in a residual functional capacity finding that she was much more limited due to her physical and mental impairments prior to August 26, 2010, than found by ALJ Gale.[38]

Delgrosso further argues that ALJ Gale impermissibly "cherry picked" her subjective evidence regarding daily activities and medication side effects so as to skew and misrepresent her testimony.

## E.   *Discussion and Analysis*

ALJ Gale's written decision expressly references correctly cites the Commissioner's regulations and rulings governing credibility assessments of forensic medical opinions and subjective testimony.   This indicates his

---

[37]     Delgrosso asserts that "the medical record is completely consistent with multiple chart notes" indicating her condition made it difficult and painful to participate in activities of daily living; she was required to take breaks during daily chores due to severe pain; her gait was impaired; she had symptoms of chronic aching and burning that were aggravated by prolonged sitting, standing, lifting, and bending. (Dkt. No. 12, pp. 12-13).

[38]     Delgrosso also maintains that the evidence shows she needs frequent rest periods without limitations; cannot work more than a few hours a day; and she would be absent beyond employer tolerance. (Dkt. No. 12, pp. 13, 20). Additionally, Delgrosso contends that the evidence demonstrates that she cannot lift over a few pounds which is inconsistent with lifting/carrying requirements of light work.  (*Id.*, pp. 17).

awareness of and intent to apply correct principles of law. ALJ Gale explained his rationale underlying each credibility assessment, and none of his reasons traverses the substance of prescribed analytical protocols. There is no basis, therefore, to conclude that ALJ Gale failed to apply correct principles of law when assessing credibility of medical opinion and subjective evidence.

### 1.  Forensic Medical Opinion

Delgrosso's arguments regarding treating physicians Turkington and Kim are red herrings. Dr. Turkington expressed no opinions regarding Delgrosso's capacity to engage in basic work activities, and Dr. Kim's assessment of Delgrosso's functional limitations clearly focused on a temporary recuperative period following knee surgery. In addition, it related to a time *after* Delgrosso already was determined to be disabled due to mental impairments, *i.e.*, after August 26, 2010. Thus, even if one were to assume *arguendo* technical errors in evaluating their opinion evidence, the result would have remained the same absent the supposed errors, *i.e.*, they were harmless at best.

When weighing medical opinions expressed by treating physician Sidhom and PA Hodgeman, ALJ Gale applied factors the Commissioner prescribes to the extent there was evidence thereof. ALJ Gale rejected Dr. Sidhom's forensic opinion on the ground that his treatment notes did not substantiate the level of limitation he opined, but rather reflected that Delgrosso's physical status was stable over time, with no neurological deficits, muscular weakness or atrophy, negative straight leg raise bilaterally and a normal gait. (T. 273-86, 288-343, 483-553). This evidence directly correlates with three of the applicable regulatory factors, and ALJ Gale acted within his wide discretion when finding that Dr. Sidhom's opinion merited little weight.

ALJ Gale applied the prescribed analytical factors when explaining why he afforded little weight to PA Hodgeman's assessments. ALJ Gale noted PA Hodgeman's lack of specialized mental health expertise, his sporadic mental health treatment, that treatments were generally routine and follow-up in nature, and that none of PA Hodgeman's treatment notes documented a marked level of mental or physical distress commensurate with PA Hodgeman's forensic opinion. He observed that PA Hodgeman is not an acceptable medical source under SSR 06-03p, but properly gave consideration to his opinions regarding severity and limiting effects of Delgrosso's impairments. ALJ Gale's negative assessment of PA Hodgeman's opinion was based on regulatory factors and was not patently unreasonable.

In short, ALJ Gale did not violate the treating physician rule or otherwise commit reversible error when assessing credibility of medical opinions.

2. <u>Subjective Testimony</u>

ALJ Gale clearly considered Delgrosso's subjective testimony because he summarized it at length. (T. 654-656). His reasons for not fully crediting Delgrosso's subjective opinions regarding intensity, persistence and limiting effects of her symptoms do not traverse the substance of the prescribed analytical protocol, and affirmatively come within the purview of the Commissioner's regulations and ruling concerning evaluation of credibility.[39]

Substantial evidence supports those reasons. A reasonable mind might accept the inference that Delgrosso's inconsistent statements proved her less

---

[39] *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (SSA regulations provide that the fact-finder "will consider all of the evidence presented, including information about your prior work record." ); SSR 96-7p, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34,483, at 34,486 (1996) (Administrative law judges are specifically instructed that credibility determinations should take account of "prior work record.").

than credible. For example, Delgrosso testified that she had radiculopathy (T. 698) despite electromagnetic testing that was negative. (T. 1563). Similarly, Delgrosso testified that she was unable to work, in part, due to blindness in her right eye (T. 699); however, she had worked with that impairment in the past, had recently obtained a driver's permit, and played competitive poker. (T. 685-88, 689, 712-13).

Delgrosso complains that ALJ Gale failed to amplify various treatments including multiple medications, surgical procedures, and trigger point injections. The fact that ALJ Gale did not mention or "amplify" every item of the medical evidence does not mean that he did not consider it. *See Durakovic v. Colvin*, No. 3:12–CV–6 (FJS), 2014 WL 1293427, at *8 (N.D.N.Y. Mar. 31, 2014) (citing *Barringer v. Commissioner of Soc. Sec.*, 358 F. Supp.2d 67, 79 (N.D.N.Y. 2005) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000) ("failure to cite specific evidence does not indicate that it was not considered."))); *accord Phelps v. Colvin*, 20 F. Supp.3d 392, 405 (W.D.N.Y. 2014).

ALJ Gale acknowledged Delgrosso's medications but noted that she failed to report adverse side effects to her health care providers. (T. 656). While Delgrosso did claim to experience side effects from Phenegrin and Salvella, she stopped taking these medications. (T. 314, 316, 593). And she does not dispute the accuracy of ALJ Gale's finding that she did not report medication side effects to her medical providers. Under this circumstance ALJ Gale's failure to mention side effects of these medications does not constitute reversible error.

Delgrosso's objection that ALJ Gale misrepresented her testimony regarding daily activities has colorable merit. For example, ALJ Gale described Delgrosso's daily activities as cooking 1-3 times a day and shopping 1-2 times a

week, but Delgrosso testified in June, 2010, that she did so *with her brother's help*. (T. 40-41). Similarly, ALJ Gale stated that Delgrosso enjoys fishing and horses (T. 655), but Delgrosso testified in August, 2013, that she *used to* fish, but did not have any hobbies in which she regularly engaged. (T. 712).

ALJ Gale's failure to accurately depict these aspects of Delgrosso's subjective testimony tarnishes an otherwise topnotch decision, but it does not evince so serious a misunderstanding of Delgrosso's statements that it cannot be deemed to have complied with the legal requirement that they be taken into account. Delgrosso does not dispute accuracy of ALJ Gale's portrayal of other daily-living activities such as participating in competitive poker tournaments, attending to personal hygiene, performing light housework chores such as dusting and washing dishes and putting away groceries, ambulating without an assistive device, and preparing a simple meal. (T. 655).

Careful review of ALJ Gale's decision does not indicate that he failed to consider all of the subjective evidence or cherry-picked only evidence supporting his residual functional capacity finding. Rather, he rejected it on credibility grounds, and provided plausible and valid reasons therefor. Hence, ALJ Gale's failure to explicitly acknowledge Delgrosso's expatiations in some aspects of Delgrosso's testimony does not constitute reversible error.

## IX.  Substantial Evidence

A reviewing court has an independent duty to determine whether substantial evidence supports ALJ Gale's crucial finding of Delgrosso's residual functional capacity for a limited range of light exertional work during the period of July 1, 2003, through August 25, 2010. ALJ Gale based this finding primarily on evidence provided by nonexamining, reviewing medical consultants.

Dr. Charles Plotz, M.D., a rheumatologist with a secondary specialty in internal medicine, reviewed Delgrosso's medical records. On December 7, 2012, he responded to written interrogatories pertaining to Delgrosso's *physical* capabilities. He opined that Delgrosso could lift and carry up to 20 pounds occasionally, and 10 pounds frequently. (T. 2957). Further, in an eight hour work day, Delgrosso could sit for 6 hours at a time for a total of 7 hours; stand for 3 hours at a time for a total of 3 hours; walk for 3 hours at a time for a total of 3 hours; and did not need a cane to ambulate. (T. 2958). She could frequently use her upper extremities to reach in all directions, handle, finger, feel, and push or pull objects, could occasionally use her feet to operate controls, and could occasionally engage in postural activities except for climbing ladders and scaffolds. (T. 2959-60). She should avoid unprotected heights but could occasionally work with moving machinery, operate a moving vehicle, and work with temperature extremes. (T. 2961-62).

Dr. Woodrow Janese, M.D., a neurosurgeon and neurologist, also reviewed Delgrosso's medical records and answered an identical set of written interrogatories on May 18, 2012. He opined that Delgrosso could lift and carry up to 50 pounds occasionally, and up to 20 pounds frequently. (T. 2684). In an eight-hour work day, she could sit for 4 hours at a time for a total of 6 hours; stand for 4 hours at a time for a total of 6 hours; and walk for 4 hours at a time for a total of 6 hours; and did not need a cane to ambulate. (T. 2685). She could continuously use her upper extremities to reach in all directions, handle, finger, feel, and push or pull objects; could continuously use her feet to operate controls; and could frequently climb stairs and continually balance, but only occasionally climb ladders or scaffolds, stoop, kneel, crouch, or crawl. (T. 2686-87). She could

continuously work with unprotected heights and moving machinery, operate a moving vehicle, and work with temperature extremes. (T. 2688).

Dr. Stuart D. Kaplan, M.D., a rheumatologist with a specialty in internal medicine as well, reviewed Delgrosso's medical records. At the June 26, 2013, evidentiary hearing, he testified that Delgrosso could lift and carry up to 20 pounds occasionally and up to 10 pounds frequently. (T. 3126-27). In an eight-hour work day, she could sit for 4 hours at a time for a total of 6 hours; stand for 2 hours at a time for a total of 3 hours; and walk for 2 hours at a time for a total of 2 hours; and did not need a cane to ambulate. (T. 3127-29, 3133). She could frequently use her upper extremities to handle, finger, or feel objects; could occasionally reach; but should only reach overhead, push , or pull with her upper extremities for less than a third of a workday due to her breast-reconstruction surgeries, which began in November 2010. (T. 3133-34). She could continuously use her feet to operate controls; and could occasionally engage in postural activities, except she should avoid using ladders or scaffolds, working with unprotected heights or moving machinery, and operating a motor vehicle. (T. 3135-36). Further, she could occasionally be exposed to temperature extremes. (T. 3136).

ALJ Gale further considered consultative opinions of examining physicians, Sandra Boehlert, M.D. and Andrew Rutherford, M.D. (T. 362-69, 2037-41). Dr. Boehlert, who specializes in internal medicine, examined Delgrosso on September 17, 2010, and found "no limitations." (T. 2040). Dr. Rutherford, who also specializes in internal medicine, examined Delgrosso on April 26, 2008, and found her unable to perform "manual labor" duties for any

period of time[40] or jobs requiring coordination and depth perception. Her gross motor function was not affected; muscle strength was normal; migraines appeared controlled; and anxiety appeared well controlled.  (T. 366).

With respect to Delgrosso's *mental* capacity prior to August 26, 2010, ALJ Gale considered evidence provided by an examining, consultative psychologist, Dr. Sarah Long, Ph.D., on October 25, 2010.  (T. 2058-61).    Upon examination, Dr. Long opined that Delgrosso was able to follow and understand simple directions and instructions and to perform simple tasks independently. (T. 2060).   She could maintain attention and concentration and a regular schedule.    (*Id*.).    She could learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and adequately manage stress despite a "possibly low stress threshold" at the time of examination.  (*Id*.).

ALJ Gale also considered evidence from Chukwuemeka Efobi, M.D., a psychiatrist, who reviewed the evidence available at that time, and answered interrogatories addressing Delgrosso's mental limitations.  Dr. Efobi opined on December 30, 2012, that Delgrosso had only mild limitations in meeting mental demands of simple work, and moderate limitation in her ability to meet the mental demands of complex work.  (T. 2966).

Finally, ALJ Gale considered mental-capacity evidence from Delgrosso's treating counselor, Rachel Hare, LSCW, who counseled Delgrosso for over 2 years immediately preceding the June, 2013, evidentiary hearing.  (T. 2226-2228, 2342-74, 2917-18, 2835-59, 2974-3013).

---

[40]    ALJ Gale appropriately construed Dr. Rutherford's imprecise language as at most ruling out "heavy, manual labor."  (T. 659).

ALJ Gale's assessment of Delgrosso's residual functional capacity prior to August 26, 2010, fits within the mainstream of opinions expressed by these medical sources. Since consultative medical advisers' opinions qualify as substantial evidence – especially when, as here, the record lacked contrary evidence from treating sources that merited greater or controlling weight – ALJ Gale's finding is supported by substantial evidence. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2).

Delgrosso's only other evidentiary challenge meriting further discussion is her assertion that evidence from Drs. Plotz, Janese and Kaplan was not *ad rem*. Delgrosso accurately points out that these medical sources were retained by *ALJ Ryan* in connection with Delgrosso's *July 28, 2010,* application for supplemental security income. The alleged disability onset date for that proceeding commenced on *February 19, 2010.* Delgrosso reasons, therefore, that ALJ Gale could not rely on opinions of Drs. Plotz, Janese and Kaplan to determine her physical residual functional capacity during the period of July 1, 2003, through August 25, 2010. (Dkt. No. 23).

While this argument has some initial appeal, it does not survive careful scrutiny. Delgrosso's severe physical impairments during the period at issue were chronic and degenerative. If they did not progress to a level that would preclude a limited range of light exertional work by late 2010 through June of 2013, ALJ Gale rationally could infer that they were no worse in the period between July 1, 2003, and August 25, 2010.

## X.  Recommendation

The Commissioner's decision should be AFFIRMED.  Delgrosso's request to remand the unfavorable portion of ALJ Gale's decision–denying benefits prior to August 26, 2010–should be DENIED.

## XI.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___10___ day of _____May_____ 2015.

_Earl S. Hines_

Earl S. Hines
United States Magistrate Judge